Argued October 30, reversed November 14, 1951

# EGGEN et ux. v. WETTERBORG et al.

### 237 P. 2d 970

*Harry G. Hoy,* of Oceanlake, argued the cause for

appellants. With him on the brief was Kenneth M. Abraham, of Hood River.

*Teunis J. Wyers,* of Hood River, argued the cause for respondents. With him on the brief were Teiser & Martin, of Portland.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is an action of ejectment, brought by Melvin A. Eggen and Jean Eggen, as plaintiffs, against Evelyn H. Wetterborg and John Doe Briscoe, as defendants. The case was tried to the court without a jury. The court made general findings of fact and entered judgment in favor of plaintiffs. Defendants appeal.

On September 24, 1945, one Lottie L. Hasbrouck, then the owner of the premises involved in this litigation, as lessor, entered into a written lease with one James Rich, as lessee, the material portions of which lease are as follows:

"WITNESSETH: The Second party [lessee] shall pay *as full rental* for the premises during the effective term of this lease, the following *amounts* at the following times: The sum of Forty Dollars ($40.00) per month *plus one-half cent (½¢) per gallon for each gallon of gasoline,* irrespective of grade, *delivered to the herein described premises* by Second Party. The sum of Forty Dollars ($40.00) is to be paid on the first of each month in advance, while the *gallonage rental* is to be paid on or before the twentieth day of each calendar month following the calendar month in which deliveries are made.
\* \* \*

"IT IS FURTHER UNDERSTOOD AND AGREED that in the event the Second party de-

faults in payment of the rent for a period of ONE (1) month, First party [lessor] reserves the right to enter upon and take possession of said premises, and to lease said premises or sell the same, and this Agreement and Lease shall be null and void.

"* * * * * *

"The said First Party does hereby demise and lease unto the said Second Party *her property known as the Loop Service Station,* situated East of the City of Hood River, County of Hood River, State of Oregon, together with all buildings and *service station equipment* thereon. Said premises are more particularly described as follows, to-wit: (Here follows description by metes and bounds.)

"* * * * * *

"THE TERM OF THIS LEASE SHALL commence as of the 1st day of October, 1945 and shall continue to and including the 30th day of September, 1950.

"In consideration of the premises and the other considerations herein specified The First Party gives and grants to Second Party the exclusive option and privilege of extending the term of this lease for Five (5) years upon the same terms and conditions as for the original term and at the same rental hereinafter [sic] specified; to commence if said option is exercised at the expiration of the term herein granted. Second Party shall give written notice to First Party of his election to exercise this extension option not less than sixty (60) days before the expiration * * *.

"* * * * * *

"The said Second Party will keep said premises in good and tenantable repair, externally and *internally, for gasoline service station purposes,* during the term of this lease *and will make no additions or alterations to or upon said premises* without the consent of the said First Party first being obtained in writing.

"The said Second Party will not assign this

lease to any party or parties, firm or corporation
* * *'' (All italics ours.)

For some time immediately prior to the making of said lease, the said Lottie L. Hasbrouck had been engaged in operating a gasoline service station on said premises under the name of ''Loop Service Station'' and had bought and sold oil products of the Richfield Oil Corporation. On the top of the service station building was a Richfield sign, which was maintained after the lease was entered into.

Before and at the time this lease was entered into, as well as at all times since, the said James Rich was and is engaged in the business of selling and distributing, at wholesale, oil products of the Richfield Oil Corporation as a commission agent of said corporation.

On December 1, 1948, James Rich, as the first party, entered into a leasing agreement in writing with plaintiffs, as second parties, which, in part, reads as follows:

''The Second Party shall pay as full rental for the premises during the effective term of this lease, the following amount at the following time: the sum of Forty Five ($45.00) is to be paid on the first day of each month in advance. * * *

''The said First Party does hereby demise and lease unto the said Second Party the property known as the *Loop Service Station,* situated east of the City of Hood River, County of Hood River, State of Oregon, *together with all buildings and service station equipment thereon.*

''The term of this lease shall commence as of the 1st day of December, 1948 and shall continue to and including the 31st day of August, 1950, with an option of renewal for five (5) years by the Second Party. Second Party shall give written notice to First Party of his election to exercise this extension option not less than sixty (60) days before the expiration of this Agreement and Lease.

"The said Second Party *will keep said premises in good and tenantable repair,* externally and internally, for *gasoline service station purposes,* during the term of this lease, and will make no additions of [sic] alterations to or upon said premises without the consent of the First Party * * * ." (All italics ours.)

During their occupancy of the premises, plaintiffs gave their principal attention to the operation of a beer tavern in the service station building on said premises, though they continued the retail sale of gasoline.

On or about October 10, 1949, the buildings and service station equipment located on the land covered by the lease agreement were completely destroyed by fire. At sometime prior to the fire the premises in question, subject to the original lease, had been conveyed by the original lessor, Lottie L. Hasbrouck, to the defendant Evelyn H. Wetterborg.

Shortly after the fire, the defendant Wetterborg and her agents, proceeding upon the theory that the complete destruction of the service station buildings and equipment by fire terminated the lease, went upon the premises and took possession thereof for the purpose of removing the debris therefrom and constructing a new building thereon.

Plaintiffs then instituted this action to recover possession of the premises.

No question is raised here respecting the exercise of the options to renew contained in the lease and sublease.

As their first assignment of error, defendants contend that plaintiffs, being sublessees, have no legal estate in the premises sufficient to qualify them to bring an action of ejectment against the principal landlord. The trial court ruled against this contention, and defendants assert that the court erred in that respect.

■ It is true, as defendants contend, that to qualify as a plaintiff in an action of ejectment, one must have a legal estate in the property involved, as well as a present right to the possession thereof. Section 8-201, OCLA, provides:

> "Any person who has a legal estate in real property, and a present right to the possession thereof, may recover such possession * * * by an action at law. * * *"

■ It is our opinion that the plaintiffs, under their sublease, did have a "legal estate" in the premises within the meaning of this statute.

In 1 Tiffany, Real Property (3d ed) 143, § 94, the following rules are stated:

> "One who holds land as tenant of another has the possession of the land, unless he has divested himself of the possession by creating a subtenancy, in which case, applying the same rule, *the subtenant has the possession*.
>
> "Possession involves not only the exercise of acts of ownership over the land, but also the exclusion of the exercise of such acts by others. That is, possession is necessarily exclusive * * *.
>
> "The principle that the tenant has the possession of the land applies as against his landlord as well as against third persons, and consequently an unauthorized entry by the landlord renders the latter liable to an action of trespass quare clausum fregit, or its statutory equivalent, at the suit of the tenant. *And since the lessee or other person claiming under the lease is entitled to the possession as against the landlord, he may maintain ejectment against the latter if excluded by him from the possession unless he has made a sublease, thereby putting the right of possession in another.*" (Italics ours.)

Leaving out of consideration for the moment the effect upon the lease and sublease arising by reason of the complete destruction of the buildings and equipment, which will hereafter be discussed, and considering the matter solely as though no fire had occurred, the plaintiffs had a present right to possession of the premises. That right could be lost only by termination of their sublease by their immediate lessor for nonpayment of rent as in the lease provided, or by the termination of the original lease by the landlord for failure of the lessee therein to pay rent as required by the agreement. The right to possession on the part of plaintiffs was exclusive as against their own lessor and also the principal landlord. They are proper parties plaintiff in this action, and the trial court did not err in so holding.

As their second assignment of error, defendants contend the trial court erred in not holding as a matter of law that the complete destruction of the buildings and equipment worked a termination of the original lease, and with it, the sublease.

■ According to the common law, a tenant remains liable for the agreed rent of demised premises so long as any part thereof remains in existence capable of being occupied or enjoyed by him, irrespective of injury or destruction by fire or other casualty. And by the same rule, the landlord may be held to the terms of the lease. *Harrington v. Watson,* 11 Or 143, 3 P 173, 50 AR 465; 51 CJS, Landlord and Tenant, 670, § 99; 52 CJS, Landlord and Tenant, 254, § 486; 16 RCL, Landlord and Tenant, 956, § 465.

■ However, there are well-recognized exceptions to this rule. When parties enter into a contract on the assumption that some particular thing necessary to its

performance will continue to exist and be available for the purpose, and neither party agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to the implied condition that, if before the time for performance, and without the default of either party, the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it. This doctrine is known in this country as "supervening impossibility of performance." *Dorsey v. Oregon Motor Stages,* 183 Or 494, 503, 194 P2d 967; 6 Williston, Contracts (rev ed) 5451, § 1946. The rule is stated by Williston as follows:

> "It is now well settled that where the existence of a specific thing is necessary for the performance of a contract, the accidental destruction or nonexistence of that thing excuses the promisor, unless he has assumed by his contract the risk of its existence."

See also *Texas Co. v. Hogarth Shipping Co.,* 256 US 619, 629, 41 S Ct 612, 65 L ed 1123; *Leonard v. Autocar Sales & Service Co.,* 392 Ill 182, 187, 64 NE2d 477, 163 ALR 670; *Swiss Oil Corporation v. Riggsby,* 252 Ky 374, 67 SW2d 30, 33; *Steamboat Co. v. Transportation Co.,* 166 NC 582, 82 SE 956; *Tulsa Opera House Co. v. Mitchell,* 165 Okla 61, 24 P2d 997, 1000.

■ The rules applicable to the construction of written contracts in general are to be applied in construing a written lease. Such a contract must be considered as a whole, and from such examination the intent of the parties must be gathered. Such construction should be given the agreement, if possible, as will render all its clauses harmonious, so as to carry into effect the actual purpose and intention of the parties as derived therefrom. *Dellwo v. Edwards,* 73 Or 316, 323, 144

P 441; *Harrington v. Watson,* supra; 51 CJS, Landlord and Tenant, 849, § 232a.

We now give our attention to the provisions of the original lease to ascertain the intention of the parties as disclosed thereby.

■ It will be recalled that, at the time this lease was entered into, defendant Wetterborg's predecessor in interest was engaged in the operation of a service station on the demised premises. The premises were known as "Loop Service Station," and Richfield oil products were sold at retail therefrom. The lessee was the wholesale distributor of such products in that territory.

The contract in question contained no restriction against subletting by the original lessee, and from the contract itself, as well as from the situation of the parties at the time it was executed, it may well be implied that the parties intended there should be a subletting, because it was hardly to be expected that the lessee would operate the premises in person. By the terms of the contract, it was contemplated that he would continue his operations as a distributor of oil products to the premises.

■ Neither does the contract contain any restrictions respecting the use to which the premises might be put, other than what we believe to be a requirement that they be operated as a service station. The operation of a restaurant, or a beer tavern, in connection with the use of the premises was not a violation of the terms of the lease, just so long as the tenants continued at the same time to operate the service station. But as we shall later point out, the continued operation of the service station was mandatory; it was essential to a performance of the terms of the lease.

Different from most written leases, the document

under consideration contained only one cause for termination of the lease by the landlord, that is, nonpayment of rent. In most cases the lease contains a clause providing for termination by the landlord for any breach of the covenants of the contract on the part of the tenant to be performed. Nor does this lease contain any provision respecting the contingency of fire or other casualty that might render the demised premises unfit for tenancy.

But taking the agreement by its four corners and considering every part thereof, particularly in the light of the situation of the parties when it was executed, its intent and purpose are quite apparent.

■ Foremost, the rental to be paid is composed of two distinct elements: (1) $40.00 per month, and (2) plus ½¢ per gallon for each gallon of gasoline delivered to the premises. This gallonage provision is a vital and inseparable portion of the agreed rental. Over the years it provided substantial amounts received by the landlord above the fixed sum of $40, in one month producing as much as $24.98. Naturally, the amount varied from month to month.

Next, the agreement demises the premises known as the "Loop Service Station," under which name the landlord had conducted a service station business at that place for a number of years. In addition to the sale of oil products as a part of such business, rest rooms for the traveling public were maintained in the buildings forming a part of the premises. The rest rooms were a very important adjunct to the operations, an integral part thereof.

After describing the service station by name, the lease provided that the demise should include "all buildings and service station equipment thereon." It

then describes *said premises* (Loop Service Station) by metes and bounds.

Then appears a very important part of this agreement, viz.: "The Second Party [lessee] will keep said premises in good and tenantable repair, externally and *internally, for gasoline service station purposes,* during the term of this lease." (Italics ours.)

Here is a very definite statement by the parties that the premises were to be maintained and operated "for gasoline service station purposes." Those aims contemplate more than the mere sale of gasoline. This is conclusively demonstrated by the requirement that, for such ends, the lessee is required to keep the premises in good repair "internally." "Internally," as here used, could refer only to the buildings comprising the service station.

The lease then provides: The lessee "will make no additions or alterations to or upon said premises." Under this provision the lessee is barred from constructing any improvements whatever upon the land or buildings. Even if he desired to do so, he had no right to rebuild the service station so as to be able to carry out his agreement to operate it and pay gallonage rental.

█ Clearly, it was the intent of the parties that the entire premises, including the buildings, be operated "for gasoline service station purposes"; that was the primary consideration for the contract; other uses were mere incidents.

Necessarily, the premises must be operated for such service station purposes in order that the amount of rental due the landlord each month may be determined. If not so operated, there would be such a failure to pay rent as would justify a termination of the lease under the express terms thereof. Performance of the

contract in question depended entirely upon the continued existence not only of the service station equipment, but also of the buildings used in connection therewith; it was so intended by the parties.

A case very much in point is that of *Land Associates Corporation v. Grand Union Stores, Inc.*, 261 App Div 1014, 25 NYS2d 986. In that case it appears Grand Union Stores had entered into two leases, one for premises described as 141 Glen street, and the other for 139 Glen street. The two premises thus leased joined and were operated by the lessee, Grand Union Stores, as one store without segregation of monies received from sales. The lease for 139 Glen street provided a rental of $3,000 per year, *together with one-eighth per cent of the gross sales of the lessee at both 141 and 139 Glen street.* During the tenancy under the lease of 141 Glen street, Grand Union Stores were compelled to remove therefrom as the result of a foreclosure action. The court held that "this terminated the lease for No. 139 *because it was no longer possible to ascertain the amount of rent which should be paid* under the lease for No. 139." (Italics ours.)

In the light of the authorities hereinabove mentioned, as applied to the situation in the instant case, we find that the destruction of the buildings and service station equipment by the fire in question worked a termination of the original lease, and, of course, the sublease. Upon such termination the landlord was lawfully entitled to possession.

Judgment reversed.