GLICKMAN, APPELLANT, *v.* COAKLEY ET AL., APPELLEES.

(No. 47997 — Decided November 26, 1984.)

*Robert C. Tucker,* for appellant.
*David A. Nelson,* for appellees.

MARKUS, J. Plaintiff-buyer paid defendant-sellers for an option to purchase their shares in a federally insured bank and thereby give plaintiff-buyer a controlling interest. Believing that the government later barred the sale, the buyer sought the return of his option payment by invoking "termination" provisions in the option agreement. At the close of the evidence in a jury trial, the trial court directed a verdict for defendant-sellers. The court ruled that the buyer could not exercise his contractual "termination" right and recover his payment unless the Federal Reserve Board expressly disapproved the sale. We disagree and reverse for a new trial on limited issues.

I

Individually and as a trustee, buyer entered into a written stock option agreement on August 22, 1979. Pursuant to that agreement, buyer paid sellers $599,998.79 for the right to purchase sellers' shares at a stated price until April 15, 1980. The parties knew the potential purchase would cause the buyer to control more than ten percent of the outstanding bank shares. They also knew that federal law required the Federal Reserve Board to review such a transaction, and barred its completion if the board disapproved it.

Within one month after executing the option agreement, the buyer filed the prescribed application notice and an amended application notice with the Federal Reserve Board. On September 25, 1979, the board acknowledged receiving the buyer's notice and his supporting data. Its letter of instructions said he could purchase the stock after sixty days (November 24, 1979) unless the board disapproved the purchase or extended its time to review the transaction. On November 20, 1979, the board notified the buyer that it had extended the review deadline for thirty days to December 24, 1979.

During its review, the board presumably investigated and evaluated data regarding the buyer's personal, managerial, and financial circumstances. Additionally, the board sought to determine whether the settlor of the trust managed by the buyer was involved in the transaction. Board staff members seemed to be concerned about accusations that the settlor had relationships with persons involved in organized crime. The bank's management, who are not parties to this transaction or this lawsuit, opposed the sale. On December 19, 1979, counsel for the bank's management met with the board's staff to supply a large quantity of allegedly derogatory materials.

Consequently, the board further extended its time to review the proposed purchase for an unspecified interval by a letter dated December 20, 1979:

"* * * [T]he period during which a disapproval of the notice may issue has been extended. The proposed acquisition may not be made until you are advised by the Board or this [Cleveland] Reserve Bank that it does not intend to disapprove the change in control that is the subject of the notice.

"It is the Reserve Bank's intention that this extension will last only so long as it is necessary for the submission of required information and for that information to be analyzed and acted upon. It is conceivable, however, that our analysis may discover other material information that is needed for the adequate consideration of the notice, and if that occurs we will advise you as promptly as possible."

Although buyer's counsel protested this indefinite extension, the board adhered to its position.

Approximately one week later, the bank filed suit against the buyer and allegedly related interests in a New York federal court. The bank's suit sought to enjoin the sale and to compel purportedly necessary disclosures. The Federal Reserve Board awaited progress in that case as the parties periodically supplied products of their discovery efforts. On March 12, 1980, the board wrote the buyer: "[T]he Board has extended until May 12, 1980, the period during which a disapproval may be issued." The letter requested the buyer to supply copies of prospective depositions and other discovery materials developed in the New York case through April 25, 1980.

By its express terms, buyer's option right expired on April 15, 1980. His contractual right to "terminate" and recover his option payment "in the event that he may not legally purchase the shares" expired March 15, 1980. With knowledge of the board's letter dated March 12, the buyer sought to invoke the termination provision in the written option agreement.

By telephone, the buyer discussed his intention to terminate with the sellers' agent who was temporarily out of the country. The buyer then sent sellers the written notice required to exercise his claimed right to terminate in a letter dated March 12, 1980. Sellers' agent returned to his office and received the original of that letter by certified mail on the morning of Monday, March 17. The buyer also presented evidence that his receptionist delivered a copy of that letter to sellers' agent's office on March 13 or 14. The sellers disputed the timeliness of the letter delivered on March 17 and presented contrary evidence about the claimed delivery on March 13 or 14.

Buyer's termination notice requested sellers to transfer bank shares equivalent to the option payment. The termination provisions of the contract required the sellers to provide such shares or to return the full consideration paid for the option if the buyer terminated. Buyer had simultaneously asked the Federal Reserve Board to authorize his acquisitions of this much smaller number of bank shares. Eight days later, the board communicated its intention not to disapprove that more limited acquisition.

Sellers failed to supply the bank shares equal to the option consideration or to return buyer's option payment. Instead, the sellers purported to exercise their contractual right to "put" the total shares for purchase by the buyer pursuant to their agreement. Sellers could compel buyer to purchase the shares at the agreed price before April 15, 1980, if (a) the buyer had not exercised his option to buy before March 1, 1980, (b) the Federal Reserve Board had not disapproved the sale, and (c) the period in which the board could disapprove the transaction had expired. Believing that he could not legally accept sellers' "put," the buyer rejected it. Ultimately, both buyer and sellers sold their

holdings of this bank's stock to a new purchaser.

Thereafter, buyer brought this action to recover the option payment with interest, plus attorney fees and expenses required to effect his recovery. Sellers counterclaimed, asserting that buyer breached the agreement and owed them their resulting interest losses. At the beginning of the trial, sellers voluntarily dismissed their counterclaim, presumably because their sale profits exceeded their claimed interest losses.

Buyer presented testimony from himself, two of his office employees, a member of the board's legal staff, and his own Washington counsel. Sellers offered testimony from their agent, his secretary, the buyer's Cleveland counsel, and the beneficiary and accountant for the trust administered by the buyer. Both sides submitted exhibit evidence, including the governing agreement and relevant correspondence. At the conclusion of all the evidence, the court granted defendant-sellers' motion for a directed verdict. The court concluded that buyer's right to terminate the option "is contingent upon disapproval of his notice by the Fed, which the evidence shows never occurred."

## II

Buyer's sole assignment of error challenges the court's ruling on sellers' motion for a directed verdict. The parties' appellate briefs dispute (1) whether buyer had a right to terminate the option and recover his option payment, and (2) whether buyer exercised any right to terminate in a timely fashion. We hold that both issues involved factual questions which the jury should have resolved, so we reverse and remand for a trial of those issues.

The parties assert that the following provisions in their agreement relate to buyer's right to terminate:

"1. *Grant of Option*

"* * * As consideration for the option right herein granted, Glickman [the buyer] has paid to each of the Shareholders concurrently with the execution of this Agreement that amount which is set forth in Schedule A attached hereto. Such consideration paid for the grant of the option shall not be offset against the option exercise price provided for herein, and shall not be refundable, whether or not the option is exercised.

"* * *

"7. *Put*

"In the event that Glickman [the buyer] shall not have given notice of the exercise of the option herein contained prior to March 1, 1980 and if the Board of Governors of the Federal Reserve System has not issued its written notice of its intent to disapprove of the purchase and the period in which said Board may disapprove of the purchase has expired, then and in that event the Shareholders may, by notice given by their agent on their behalf, determine that the shares shall be put to Glickman. * * *

"8. *Glickman's Covenants*

"Glickman [the buyer] agrees to proceed forthwith to file the requisite notice with the Board of Governors of the Federal Reserve System under the Change in Bank Control Act of 1978 and to use his best efforts to furnish the required information. If the application results in a decision to disapprove the purchase, Glickman may but shall be under no obligation to request a hearing with the Board or to appeal from such hearing to the United States Court of Appeals. In the event that at any time Glickman ceases affirmatively to pursue his application under said Act, he shall promptly give the notice provided for in Section 9 hereof.

"* * *

"9. *Right to Terminate Option*

"Glickman [the buyer] may, by notice to the Shareholders delivered on or before March 15, 1980, terminate the

option herein contained in the event that he may not legally purchase the shares. In such event the option and put rights herein contained shall terminate as of the date of such notice, and each of the Shareholders shall cause to be transferred to Glickman, within ten (10) days after receipt of such notice, that number of whole shares of UCC owned by each Shareholder which is equal to the consideration paid to such Shareholder for the option herein granted ($2.04539 per share) * * *. In the event that any Shareholder fails to deliver his shares within such 10 day period, such Shareholder shall be personally liable to pay back the option price (2.04539 per share) in cash together with interest thereon at the rate of 8% per annum and the costs of collection, including attorney fees, plus any damages suffered by reason of such breach."

With the exception of the provisions for buyer's right to terminate, these contractual terms establish a relatively traditional bilateral option to purchase and sell securities. The buyer acquired a right to compel a specified sale until a fixed date. Sellers received a nonrefundable payment, buyer's promise of "best efforts" to furnish governmentally required information, and limited rights to compel buyer's acceptance of the same sale. The buyer's contractual right to terminate simply limited his common-law right to avoid the transaction on grounds of impracticability or impossibility of performance.

Absent contrary contractual terms, either party can often avoid an agreement when governmental activity renders its performance impossible or illegal. See Restatement of the Law 2d (1981), Contracts, Sections 264-268, 272; cf. Security Sewage Equip. Co. v. McFerren (1968), 14 Ohio St. 2d 251 [43 O.O.2d 432]; West L.A. Institute for Cancer Research v. Mayer (C.A.9, 1966), 366 F.2d 220, 223; Lowenschuss v. Kane (S.D.N.Y. 1973), 367 F.Supp. 911, 915.

Since the courts will not enforce an agreement to perform an illegal act, the parties presumably condition their contract on the legality of its performance. See Restatement of Contracts 2d, supra, at Chapter 11, Introductory Note, and Section 264; 6 Corbin, Contracts (1962 and 1984 Supp.), Section 1346; cf. R.C. 1302.73, Official Comment 10 (comparable rule under commercial code for failure of presupposed conditions).

Under some circumstances, the parties can assign the risks of possible losses between themselves. In this transaction, ultimate impracticability from governmental disapproval or delayed governmental action posed a risk of loss for one or both of the parties. If the buyer could avoid the agreement and recover his option payment, sellers might suffer uncompensated restrictions on their ability to sell the stock elsewhere. If the buyer could not avoid the agreement, he might suffer the loss of his option payment for no benefit.

The parties assigned that risk of loss to the buyer unless (a) buyer made his best efforts to obtain governmental approval, (b) he could not thereafter legally purchase the shares, and (c) he exercised the resulting ability to avoid his loss by giving a timely notice of termination. If the buyer satisfied all three conditions, sellers accepted the risk of loss. They would return the option payment in shares or in cash despite their temporary inability to sell the optioned shares to others. If the buyer failed to satisfy any one or more of those conditions, he accepted the risk of loss. In that event, he could not recover his option payment despite his inability to enforce the sale.

Sellers urge that the contract is illusory unless the buyer's right to terminate required the board's express disapproval. Otherwise, they claim that the buyer could avoid the agreement at any time before the board acted

definitively. However, the buyer could not terminate the contract unless he first exercised his best efforts to obtain board approval. His duty to make such efforts extended for a reasonable time commensurate with the circumstances of the governmental process and the underlying transaction. Cf. Restatement of Contracts 2d, *supra,* at Section 261, Comment *d*; Corbin on Contracts, *supra,* at Section 1346 (both discussing comparable common-law duty).

### III

Sellers submit three reasons why the buyer failed to prove he could not legally purchase the shares when he attempted to invoke the termination provision. First, the board never formally disapproved the transaction. Second, the board allegedly acted beyond its lawful authority by unjustified extensions, so the board lost its power to disapprove the sale. Third, the buyer did not abandon his efforts to obtain the board's approval until two months after he sought to terminate the agreement. Although the buyer disputed these contentions, none of them defeat the buyer's proof that he could not legally purchase.

The board expressly instructed the buyer that he should not complete the purchase until the board completed its review without disapproving the transaction. The board clearly asserted that it had not completed its review and had not disclaimed an intention to disapprove. Violation of the board's lawful instructions subjects the violator to injunctive relief and a civil penalty up to $10,000 per day the violation continues. Section 1817 (j)(15), Title 12, U.S. Code. The board's action here was tantamount to a temporary disapproval up to the time that buyer sought to terminate the contract.

Despite the sellers' contrary contention, the courts presume the legality and propriety of the board's actions. Cf.

*F.C.C.* v. *Schreiber* (1965), 381 U.S. 279, 296. However, we need not determine whether the board had authority to extend its review time and thereby prevent a sale as it did here. At common law, a contracting party can avoid the contract when government orders render its performance impracticable, even if those orders are invalid. See Restatement of Contracts 2d, *supra,* Section 264, Comments *a* and *b*; *West L.A. Institute for Cancer Research* v. *Mayer, supra,* at 224; cf. R.C. 1302.73, Official Comment 10. The contracting party can accept governmental instructions without appealing to a higher authority or risking punishment for violating those instructions. *Id.*

In this case, the contract accepts and applies those common-law principles. Paragraph 8 allows the buyer to dispute the board's disapproval by appeals, but it also allows him to accept the board's decision without further challenge. Since the contract allows the buyer to accept a final adverse ruling without appeal, it certainly does not require him to challenge any lesser action. A decision that the board lacked authority for its orders would not affect the buyer's right to terminate under the terms of this agreement.

Finally, the fact that the buyer continued to seek board approval for this purchase after giving notice to terminate it does not defeat his claim. The buyer explains that he pursued board approval after invoking the termination terms because board consent would have facilitated settlement of his New York case. However, his continued interest in board approval has no significance to his right to terminate, regardless of his reasons or explanations. The contract nowhere requires him to abandon possible approval as a condition to terminate.

Paragraph 8 requires the buyer to send his termination notice promptly if he affirmatively ceases to pursue his application for approval. Without that pro-

vision, the buyer could impose uncompensated restrictions on sellers' ability to sell elsewhere while he delayed his right to terminate. In their efforts to assign the risks of loss, the parties sought to avoid purposeless losses. Sellers could justly complain if the buyer abandoned his approval efforts, retained his right to the option payment, but did not terminate sellers' contractual duties.

The buyer's duty to invoke his termination rights promptly after accepting the board's disapproval does not mandate the converse. The sellers suffer no loss if the buyer continues to seek board approval after sending his notice to terminate the option agreement. Indeed, the buyer's continued efforts might produce board approval which was still mutually desired by the parties. There was no reason why the contract would require the buyer to abandon his efforts to obtain board approval before sending his termination notice. Hence, it is understandable that the contract made no such requirement or condition for the buyer to terminate.

### IV

As a matter of law, the buyer could not "legally purchase the shares," within the meaning of paragraph 9, when he sent his termination notice. However, his right to terminate also depended on his compliance with his duty to make his best efforts to obtain board approval. He had unquestionably waited a reasonable time before seeking to terminate only two days before his termination right ended.

However, the parties presented conflicting evidence whether he made his best efforts for approval to the time he sent his termination notice. The buyer and his attorneys insisted that he did. The sellers presented evidence from which the jury could find that the buyer failed to cooperate fully with the board's investigative efforts. The trier of fact should resolve this factual dispute on remand.

### V

If the buyer had a right to terminate the contract and recover his option payment, he had to exercise that right by a timely notice. Time is of the essence for an option agreement, since it is a contract to retain purchase rights for a limited time. Similarly, time is of the essence here to cancel the option agreement within a limited time before the option expires. Cf. *I.T.T.* v. *United States* (Ct. Claims 1972), 453 F.2d 1283, 1290; *Ducc Realty Co.* v. *Cox* (Tex. Civ. App. 1962), 356 S.W.2d 807; *Bollen* v. *McCarty* (1972), 252 Ark. 442, 479 S.W.2d 568.

The parties cite the following contract provisions to support their respective positions about the timeliness of the buyer's notice:

"9. *Right to Terminate Option*

"Glickman [the buyer] may, by notice to the Shareholders delivered on or before March 15, 1980, terminate the option herein contained in the event that he may not legally purchase the shares. * * *

"* * *

"12. *Attorney in Fact of the Shareholders*

"Each of the Shareholders, by the execution of this Agreement, hereby irrevocably appoints Joseph C. Coakley [hereinafter referred to as sellers' agent] as the agent, proxy, and attorney in fact of such Shareholder for all purposes of this Agreement, including without limitation full power and authority * * * to receive or give notices on behalf of the Shareholders. * * *

"* * *

"14. *Notices*

"All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if hand delivered or sent by registered or certified mail (postage prepaid).

"(a) If to the Shareholders, to:

Joseph C. Coakley [sellers' agent]
660 Union Commerce Building
Cleveland, Ohio 44115 * * *''

Reading these two provisions together, we conclude that the contract required actual delivery by messenger or certified or registered mail by March 15, 1980. Oral notice by telephone did not satisfy the contract terms. Cf. *I.T.T.* v. *United States, supra,* at 1288-1289. Delivery to the designated address for this sellers' agent did suffice, regardless of the agent's availability at that address when delivery occurred.

The language in paragraph 9 specifically governs the buyer's termination notice, so it prevails over language in paragraph 14 which governs notices generally. Further, paragraph 14 describes the manner by which notices can be communicated rather than the time when they are effective. Compare *Cities Service Oil Co.* v. *National Shawmut Bank* (1961), 342 Mass. 108, 172 N.E.2d 104, 105-106, with *Call* v. *Alexander Coal Co.* (1983), 8 Ohio App. 3d 344, 345.

Without the requirement in paragraph 9 for timely delivery of the termination notice, paragraph 14 might mean such notices are effective when properly mailed. With the clear requirement for timely delivery in paragraph 9, any ambiguity in paragraph 14 requires no construction.

The buyer argues that delivery on March 17 satisfied his contractual duty to deliver on March 15, because March 15 was a Saturday. He cites statutes and court rules which extend deadlines that fall on a Saturday to the following Monday. *E.g.,* Civ. R. 6(A); R.C. 1.14. They regulate activities by or transactions with public agencies at unforeseen future dates. They have no application to a private agreement which calls for action by a specific date.

The parties knew or should have known that March 15, 1980, was a Saturday when they executed their agreement in 1979. They mutually agreed upon that date as the deadline for the buyer to invoke his termination right. This court should not modify the parties' clear agreement by applying rules used in other contexts.

Consequently, the buyer's notice by certified mail was not effective to preserve his termination right, since all parties agree that it arrived on March 17. However, conflicting evidence supported and denied actual delivery of a copy by the buyer's receptionist. If she delivered that copy on or before March 15, it was timely. Otherwise, the buyer lost any termination right he had by failing to provide the contractually required timely notice. Here again, the trier of fact must resolve this factual dispute on remand.

The buyer's assignment of error has merit. The trial court's judgment is reversed and the case is remanded for a retrial consistent with this opinion.

*Judgment reversed and
case remanded.*

PRYATEL, J., concurs.

CORRIGAN, C.J., dissents.

CORRIGAN, C.J., dissenting. I respectfully dissent from the majority's decision because I believe that the trial court properly granted the appellees' motion for a directed verdict. Civ. R. 50(A)(4) provides:

"When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

It is my view that this standard has been met in the instant case.

Paragraph 1 of the contract in question specifically states that the consideration that the appellant paid for the option was not refundable, "whether or not the option [was] exercised." The only exception to this clause appears in paragraph 9, which begins: "Glickman may, by notice to the Shareholders delivered on or before March 15, 1980, terminate the option herein contained *in the event that he may not legally purchase the shares.*" (Emphasis added.) The appellant's argument has consistently been that, since he had not received express Federal Reserve Board approval to purchase the bank shares by March 15, 1980, then he could not legally purchase those shares and had the right to receive the consideration he paid for the option.

If paragraph 9 is considered in isolation from the remainder of the contract, the appellant's interpretation is reasonable. However, at the very least, paragraph 9 must be read in conjunction with paragraph 8. The latter sets forth the covenants to which the appellant must have adhered in order to enforce the agreement. First, the appellant was required to file notice with the Federal Reserve Board that he intended to purchase the bank shares. Secondly, he was required to utilize his best efforts to furnish information to the board. Third, if the board disapproved the transaction, the appellant could have, but was not required to, pursue administrative and/or judicial remedies to overturn the board's decision. Finally, if the appellant affirmatively ceased to pursue his application to purchase the shares, then he was required to give notice to the appellees as set forth in paragraph 9.

Under any reasonable interpretation of paragraphs 8 and 9, the appellant was required to receive Federal Reserve Board disapproval before he could terminate the option. If the appellant was not required to receive disapproval before he could terminate the option, then he could have terminated the option immediately after signing the agreement, since, at that point in time, under his interpretation, he could not legally have purchased the shares. Further, even if the appellant served the requisite notice on the Federal Reserve Board, under his reading of the agreement, he could have utilized his best efforts to supply the board with information for one week and then decided to terminate the option. Clearly, such a situation was not what the parties envisioned when reaching the agreement.

Now, the majority has imposed a reasonable time standard regarding how long the appellant was required to use his best efforts to supply the Federal Reserve Board with information. I disagree with this imposition. The board was still in the process of gathering information at the time that the appellant terminated the option. That the appellant could have lost his money was a risk of which he was aware at the time that he signed the agreement. The existence of that risk should not have necessitated the result that he was no longer required to exert his best efforts to supply the board with information at the expiration of the option period. If the board needed more time to complete its investigation, then appellant was required, under the terms of the contract, to cooperate with the board by supplying it with all required information. That the option expiration date could have come and gone without a decision by the board should have been of no consequence to that requirement.

The aforementioned sentence from paragraph 9 contains the phrase, "in *the event* that he may not legally purchase the shares." (Emphasis added.) Thus, the parties were contemplating that a particular act would signify that the appellant could not legally purchase the shares. That event was disapproval by

the Federal Reserve Board. In my view, the language of the contract is clear in its requirement that the appellant had to receive that disapproval before he could terminate the option. This is the only conclusion that reasonable minds could reach. Accordingly, I would affirm the decision of the trial court.