In the Matter of the LIQUIDATION OF PROFESSIONAL MEDICAL INSURANCE COMPANY and Professional Mutual Insurance Company Risk Retention Group, Plaintiff, G. Thomas Murff, Appellant,

v.

Scott B. LAKIN, Director Missouri Department of Insurance Receiver; Pro Med ESOP Participants Other than Jourdan and Ryan, Glenn Jourdan and Corporate Insurance Consultants, Inc., Respondents.

No. WD 60537.

Missouri Court of Appeals, Western District.

June 28, 2002.

Jonathan B. Milbourn, Kansas City, for G. Thomas Murff.

Bruce E. Baty, Kansas City, for Scott B. Lakin.

William W. Sellers, Kansas City, for Professional Mutual Ins. Co. Risk Retention.

Robert K. Sellers, Kansas City, for Glenn Jourdan and Corporate Ins. Consultants.

Before BRECKENRIDGE, P.J., LOWENSTEIN and NEWTON, JJ.

HAROLD L. LOWENSTEIN, Judge.

This appeal arises from the 1994 liquidation proceedings against an insolvent insurance carrier, Professional Medical Insurance Company (ProMed). Appellant G. Thomas Murff is a former employee of ProMed, and Respondent Scott B. Lakin is the present director of the Missouri Department of Insurance, acting in his capacity of Receiver for ProMed. In 1999, Murff asserted a claim against the ProMed estate regarding an employee stock ownership plan. The Receiver denied his claim. Murff challenged the denial of his claim, and after negotiation and mediation, the cause resulted in a settlement agreement and mutual release between Murff and the holding companies of the entities involved and the individual employees who were eligible to participate in the plan.

In 2001, Murff again challenged the distribution of that same employee stock ownership plan. ProMed and the Receiver cited the settlement agreement in arguing that Murff should be excluded from sharing in the distribution. The trial court excluded Murff from participating in the distribution of the plan. Murff appeals from that judgment.

**Factual and Procedural History**

By way of overview, the facts involve two separate employee benefit plans and an IRS private letter ruling on one of the benefit plans in the underlying receivership. As explained below, ProMed established one of the benefit plans early in the company's history. The other benefit plan, which is squarely at issue here, was established in 1992, less than two years

before ProMed went into receivership. In 2001, the IRS issued its ruling concerning that second plan, which spawned the litigation here.

ProMed, a Missouri-domiciled insurance company dealing in medical malpractice insurance, was formed in 1988. At its formation, all of ProMed's 800,000 shares of common stock were owned by the Professional Mutual Insurance Company Risk Retention Group (RRG). In 1991, RRG sold its interest in ProMed to Corporate Insurance Consultants, Inc. (CIC), a company owned and controlled by ProMed's and RRG's president, Glenn Jourdan. The next year, in 1992, ProMed created the Employee Stock Ownership Plan (ESOP), which is at the heart of this appeal. When ProMed was placed in liquidation in 1994, the majority of ProMed's common stock (416,000 shares) was owned by the ESOP.

When the ESOP was formed in 1992, the ProMed employees, including Murff, were already participating in another contribution plan which had been established several years earlier by RRG; that plan was called the Target Benefit Pension Plan (Target Plan). The stated purpose of the Target Plan was to generate retirement benefits for each employee at thirty-five percent of their total accumulated compensation at the time of retirement. Both the Target Plan and the ESOP were to operate concurrently, with contributions made to eligible employees' accounts in both plans. However, to meet the thirty-five percent goal of the Target Plan for each employee, contributions were made first to the Target Plan for those employees who had not reached their thirty-five percent goal.

The ESOP was in existence only one year before receivership. During that year, Murff made no contributions to the ESOP because his contributions went solely to the Target Plan. Two other ProMed employees were similarly situated—they made contributions only to the Target Plan and not to the ESOP.

The 416,000 shares to be owned by the ESOP had not been immediately allocated to individual participants of the plan. At the end of 1992, only some 52,194 shares were allocated to ESOP participants before the Receiver determined that ProMed was insolvent, at which point *no further allocations could be made from the remaining 363,806 shares of ProMed stock.* These unallocated shares were viewed as valueless and remained essentially untouched until 1998.

During the course of the liquidation, it became clear that a substantial amount of money would remain in the estate, even after all of the claimants were paid with interest. By early 1999, the Receiver determined that the class of claimants that included the ESOP participants, called "Class 9" claimants, were entitled to participate in considerable surplus distributions. *Accordingly, the Receiver sent out a memorandum in February of 1999 to the ESOP participants indicating that the distribution would be calculated upon each employee's initial percentage contribution to the ESOP.* Neither Murff nor the other two employees who had not contributed to the ESOP were considered ESOP participants and thus were not deemed part of the "Class 9" claimants.

In April of 1999, Murff filed a claim: 1) stating his belief that he had been excluded improperly from the ESOP participation (based on the February of 1999 memorandum), and 2) for ERISA benefits. That same month, the Receiver denied Murff's claim because all of Murff's contributions went to the Target Plan and nothing went into the ESOP and also because his claim was time barred under federal law and under a deadline imposed by the Receiver for the filing of claims. Neither

of the other two former employees who had not contributed to ESOP filed a claim with the Receiver. Murff's cause ultimately was mediated and settled in June of 1999. Murff received $150,000. The terms of the settlement are set out more fully under Murff's first point.

Also in June of 1999, the Receiver sought a private letter ruling from the IRS concerning ProMed's ESOP. In March of 2001, after having the Receiver's private letter request under consideration for almost two years, the IRS issued its ruling. Relevant to this appeal, the ruling stated that whether an employee had contributed to the ESOP did not determine whether the employee stood to participate in the ESOP's distribution. In other words, because of the IRS ruling, the ESOP would be distributed on a "compensation percentage share" basis instead of an "account balance percentage share." The Receiver accepted that ruling, and as a result, the remaining two employees who were similarly situated to Murff, in that they had not contributed to the ESOP, now became a part of the "Class 9" claimants, and they were authorized to recover from the ProMed estate.

Murff learned about the IRS private letter ruling and sought to participate in the distribution of the ESOP. Murff filed a motion to intervene and an objection to the application for approval of the Receiver's action with respect to the ESOP. Because there were two other unrelated IRS private letter requests sought in this case, the record is unclear as to whether the Receiver disclosed to Murff that he was seeking this particular private letter ruling affecting the distribution of the ESOP: Murff contends that he had no notice of the request when he signed the settlement agreement; the Receiver contends that Murff was fully informed of the request. Murff's counsel stated at oral argument that if the settlement agreement was not enforced, Murff would be entitled to $900,000 as his share of the ESOP.

In any event, because Murff had signed the settlement agreement with ProMed and Jourdan and the ESOP participants, the trial court approved the Receiver's plan to exclude Murff from the ESOP distribution. Murff claims that the trial court's ruling was in error for five reasons: 1) the express language of the settlement agreement and mutual release does not exclude him from participating in the distribution, 2) "commercial frustration" or "supervening impossibility of performance" requires the settlement agreement and mutual release to be rescinded or declared void because the private letter ruling and the receiver's unilateral acceptance of it was unexpected, 3) the doctrine of mutual mistake of fact requires the settlement agreement and release to be rescinded or declared void because the basis upon which the parties entered into the agreement was not true (i.e., because of the IRS ruling, Murff was entitled to participate in the distribution of the ESOP), 4) the doctrine of unilateral mistake requires that the settlement agreement and release be rescinded or declared void because Murff had an erroneous belief as to the facts reported by the Receiver, 5) fundamental notions of fairness and justice indicate that it is inequitable to exclude Murff from participating in the ESOP's distribution.

### Standard of Review

Review of this court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). As such, the trial court's decision will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* The evidence and all reason-

able inferences are "viewed in the light most favorable to the trial court's judgment, and all contrary evidence and inferences must be disregarded." *Miller v. Gammon & Sons, Inc.,* 67 S.W.3d 613, 618 (Mo.App.2001).

## Analysis

### I.

In his first point, Murff argues that the trial court erred in excluding him from participating in the ESOP distribution because the express language of the settlement agreement and mutual release does not operate to exclude Murff's participation in the distribution of the trust assets.

■ "Freedom of contract and peaceful settlement of disputes are encouraged in the law." *B–Mall Co. v. Williamson,* 977 S.W.2d 74, 77 (Mo.App.1998). The law presumes that a release is valid. *Angoff v. Mersman,* 917 S.W.2d 207, 210 (Mo.App. 1996).

■ Interpretation of a settlement or release is governed by the same principles as any other contract. *Andes v. Albano,* 853 S.W.2d 936, 941 (Mo. banc 1993); *Eisenberg v. Redd,* 38 S.W.3d 409, 410–11 (Mo. banc 2001). "The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *Mid Rivers Mall, L.L.C. v. McManmon,* 37 S.W.3d 253, 255 (Mo.App.2000) (citation omitted). If there is no ambiguity, then the intention of the parties should be determined from the contract alone. *Burns v. Plaza West Assocs.,* 979 S.W.2d 540, 547 (Mo.App. 1998). "A contract is ambiguous only if its terms are susceptible to more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." *Eisenberg,* 38 S.W.3d

at 411. If there is no ambiguity, then the court need not resort to construction of the contract, and instead intent is determined from the four corners of the contract. *Id.*

■ The settlement agreement was a contract between Murff, CIC, Jourdan, and "those parties whose names appear on Exhibit A hereto ("Waldeck [1] ESOP Clients") (Jourdan, CIC, and the Waldeck ESOP Clients being collectively referred to hereinafter as "Class 9 Shareholders")." Exhibit A excluded Murff and the other two employees who had not contributed to the ESOP. The stated reason for the agreement was that Murff claimed entitlement to a portion of the proceeds to be distributed to "Class 9" shareholders. The agreement further noted that Murff "has threatened legal action, including litigation and other action both within and without the Receivership, against certain Class 9 Shareholders, the trustees, as well as the Receiver arising out of or related to such claims" denied by the Receiver.

In this case, Murff does not complain of a specific "ambiguity," but argues instead that the language of the settlement agreement does not operate to preclude him from participating in the ESOP distribution. In brief, Murff argues that the definition of the shareholders has changed from when he executed the settlement. In 1999, before the IRS ruling, that class included neither Murff nor the two others that are similarly situated because they made no contributions to the ESOP plan. In essence, Murff argues that because the two others who are similarly situated to him are *now* included in the distribution and are *now* considered "Class 9" claimants, he, too, should share in the distribution and should be considered an original "Class 9" claimant. He also argues that if he becomes a "Class 9" claimant like those

---

1. Waldeck is one of the attorneys in this case.

similarly situated, then the settlement agreement prohibitions do not apply to him.

Murff's specific arguments concern three excerpts from the settlement agreement. First, he states that the settlement agreement does not apply to him based on the twelfth paragraph of the settlement agreement. That paragraph states as follows:

> The Receiver is an intended third party beneficiary of this Agreement, but no part of this Agreement is intended to release or otherwise settle or resolve any issues or disputes of any nature whatsoever between Class 9 Shareholders and Receiver. It is further agreed that no person or entity not a party hereto may rely on any statements herein, and, except as set forth herein, there is no intended third-party beneficiary of this Agreement.

Murff argues that the IRS ruling results in his becoming "an original ESOP participant/Class 9 shareholder" like the two similarly situated individuals, and, therefore, "it logically flows that the Settlement Agreement prohibitions do not apply to him." Without citing any authority, Murff argues that the broad language in this paragraph, which leaves open issues or disputes between "Class 9" Shareholders and the Receiver, means that as a newly determined "Class 9" shareholder, Murff is not precluded from complaining about the distribution. What Murff discounts, however, is that the *res* of the settlement agreement was whether Murff was an original ESOP participant. In attaining this settlement, Murff maintained that he was a participant; the Receiver argued that Murff was not. At the time of the settlement agreement, Murff's status as a participant was legally uncertain and his rights unclear.

In order to ensure that he was compensated as a result of the Receiver excluding him from that class and in order to ensure litigation was ended on the uncertain matter of whether Murff was included in the "Class 9" participants, Murff bargained for and received $150,000. The intent behind the settlement agreement, then, was to end disputes over Murff's potential share in the ESOP. To adopt Murff's argument would be contrary to giving intent to the agreement. *Mid Rivers*, 37 S.W.3d at 255.

Further, the settlement agreement quite clearly defined at the outset (and specified in Exhibit A) who was included in the ESOP distribution. The agreement therefore limited the settlement agreement to resolutions concerning Murff only because he was not listed as an ESOP participant. Subsequent determinations fashioned by an IRS ruling are inapplicable here because, for purposes of the settlement agreement, Murff was not a part of the class. To hold otherwise would be contrary to Missouri's presumption that a release is valid. *Angoff*, 917 S.W.2d at 210. In short, because of the question of whether Murff was a participant was resolved in the settlement agreement and because Murff was not listed as a participant in the "Class 9" claimants, this argument is without merit.

Murff argues next that the express language of the settlement agreement indicates that he is not precluded from asserting a claim against the ESOP based on the fourth paragraph of the agreement, which references paragraph seven. Those portions of the settlement agreement state as follows:

> 4. Murff agrees not to file suit or pursue any claim or action, in any court, tribunal or before any administrative body, of any nature whatsoever against Class 9 Shareholders, any past, present, or future administrators or trustees of

any employee stock ownership plan or trust ("ESOP"), the Receiver, or any related or affiliated entities, all as more fully set forth in paragraph [7] below. Murff further agrees to withdraw and make no further objection to the Receiver's determination of his proof of claim in the Receivership and under the ESOP, and to accept the Receiver's determination and rejection or his claim as final and conclusive of his rights as a claimant in the Receivership and as an alleged ESOP participant.

7. In consideration of the promises and agreements recited above, the receipt and sufficiency of which is expressly acknowledged, Murff . . . hereby release[s] and forever discharges[s] all Jourdan, CIC, Class 9 Shareholders, any past, present or future trustees, administrators or sponsors of any ESOP, and Receiver . . . from any and all causes of action, lawsuits, liabilities, rights or claims, whether known or unknown, which Murff may have against any of the Released Parties as of the date Murff signs this Agreement and without regard to whether or not those claims have been asserted under any legal or equitable theory whatsoever, including but not limited to any claims under . . . ERISA . . . or any similar federal, state or local law relating to employee stock ownership plans and trust.

Murff relies on paragraph four in arguing that he "is not filing suit or pursuing any claim or action *against* any of the foregoing parties." Instead, Murff argues that he "is simply asking the Court to determine his status as an ESOP participant given the IRS's new determination and the Receiver's decision to declare two formerly excluded individuals as ESOP participants." Murff also argues that he never agreed to withdraw or forego any objection to subsequent supervening events and that neither paragraph uses the word "future." Specifically, Murff argues that "the Release language *does not state* that Appellant was releasing any and all *future* determinations, lawsuits, claims, etc. that might develop in the future" (emphasis supplied by Murff). Again, Murff cites no legal authority in support of this argument.

Murff's argument here fails for two reasons. First, Murff's contention under this point looks only at two paragraphs of the agreement, though intent can be divined from the first paragraph as well. That portion of the settlement agreement states that the "Class 9" shareholders were paying Murff $150,000 to "finally settle all past, present and *future* claims of Murff" (emphasis added). As there is no ambiguity in the contractual language, it is appropriate to ascertain intent from the four corners of the contract, which in this case, includes the first paragraph. *Eisenberg,* 38 S.W.3d at 411.

Second, "[a]ny reservation or limitation as to the scope of a settlement agreement must be clearly expressed." *Angoff,* 917 S.W.2d at 211. Murff's argument entails choosing a small portion of the agreement and creating an ambiguity or exception to the requirements where there is none. The agreement clearly states that Murff will not pursue any claim, known or unknown, of any nature whatsoever. There should be no difficulty understanding what that means. If Murff had wanted to reserve the right to later ask for a declaratory judgment or ask that the settlement agreement be voided in the case that an IRS ruling favorable to his position was adopted or, perhaps more realistically, in the event that the other two employees similarly situated to him could participate, then he should have bargained for one. He did not. Murff's argument is thus without merit.

The court notes anew that Murff's 1999 claim which the Receiver denied concerned two issues: 1) whether Murff met the ESOP's eligibility requirements, and 2) ERISA benefits. The intent behind the settlement agreement was to put an end to the question of whether Murff was an ESOP participant (as well as the ERISA question). As noted *supra*, the law presumes that a release is valid. *Angoff*, 917 S.W.2d at 210. "This presumption is founded in the policy of law to encourage freedom of contract and the peaceful settlement of disputes." *Id.* (quoting *Andes v. Albano*, 853 S.W.2d 936, 940 (Mo. banc 1993)).

Murff bargained for and received $150,000 in consideration of ending that dispute. The fact that a subsequent IRS ruling would have involved now naming Murff an ESOP participant does not change the intent of the settlement agreement, which was to determine whether Murff could share in the ESOP. Murff's participation was determined in 1999. Simply because an IRS ruling adds an additional argument supporting his contention that he was an ESOP participant does not vitiate the intent of the agreement.

This point is denied.

## II.

■ In his second point, Murff argues that the trial court erred in approving the Receiver's application to exclude him from participating in the distribution of the ESOP because the doctrines of "commercial frustration" or "supervening impossibility of performance" require that the settlement agreement and release be rescinded or declared void. Murff claims that this is because the 2001 IRS ruling and the Receiver's acceptance of it was a fortuitous and unexpected event. As explained below, Murff cannot succeed under either of these theories.

■ The doctrine of impossibility of performance states that if a party is obligated by contract of performance which is possible to be performed, *he or she must perform* unless performance is rendered impossible by an act of God, the law, or the other party. *Werner v. Ashcraft Bloomquist, Inc.*, 10 S.W.3d 575, 577 (Mo.App. 2000). If a party desires to be excused from performance in the event of contingencies arising after the formation of a contract, it is that party's duty to provide therefore in the contract. *Id.*

■ The doctrine of commercial frustration differs slightly from impossibility of performance. The commercial frustration doctrine arises "if the happening of an event not foreseen by the parties and not caused by or under the control of either party has destroyed or nearly destroyed either the value of the performance or the object or purpose of the contract, then the parties are excused from further performance." *Kassebaum v. Kassebaum*, 42 S.W.3d 685, 698–99 (Mo.App.2001)(quoting *Howard v. Nicholson*, 556 S.W.2d 477, 481–482 (Mo.App.1977). "The doctrine of commercial frustration grew out of the demands of the commercial world to excuse performance in cases of extreme hardship." *Id.* This doctrine is limited so as to preserve the certainty of contracts. *Howard*, 556 S.W.2d at 483.

The crux of Murff's argument here is that "there was a total or practically total destruction of the purpose or object of the transaction." In support of that argument, Murff relies primarily on *Howard*, 556 S.W.2d at 484, in which a contractor was excused from performing under a construction contract. In *Howard*, the appellant was to construct a building to be used as a bridal salon for a specific tenant. *Id.* at 478. During the appellant's work on the building, the prospective tenant de-

clared bankruptcy. Because the building had been designed specifically for the prospective tenant, it was not suited for other uses. *Id.* at 483. As such, because of the tenant's bankruptcy, the *Howard* court held that the contractor's performance was excused under the doctrine of commercial frustration. The *Howard* court reasoned that the tenant's bankruptcy was not foreseeable and that performance under the contract—construction of a building designed for a tenant no longer able to rent it—was rendered valueless. *Id.*

In addition to *Howard,* Murff relies on *West Los Angeles Institute for Cancer Research v. Mayer,* 366 F.2d 220 (9th Cir. 1966). As in the case at bar, *Mayer* concerned an IRS ruling which occurred after contract formation. The parties were sellers and a purchaser of a business, and the contract was patterned with certain tax implications in mind. *Id.* at 222. After the contract was executed, the IRS issued a revenue ruling which severely affected the sellers' tax situation—in fact, the IRS ruling "rendered performance impossible." *Id.* at 223.

In affirming the trial court's determination that the purpose of the contract had been frustrated, the *Mayer* court rejected the purchaser's argument that the contract was not impossible. Specifically, the court noted that the performance now required under the contract was not contemplated because, after the IRS ruling, the purchase price was not equivalent to the price for which the purchasers had bargained. *Id.* at 224. The *Mayer* court also rejected the purchaser's argument that the sellers foresaw the possibility of an adverse tax ruling. *Id.* at 225. The court noted that the question was whether interpretation of the contract showed that the risk of subsequent events, whether or not foreseen, was assumed by the promisor. The court concluded that under the facts presented, the

purchasers had not assumed the risk of a adverse tax ruling. *Id.*

Murff relies also on *Walker v. Continental Life and Accident Co.,* 445 F.2d 1072 (9th Cir.1971). In that case, a party to a contract sought to rescind certain annuity loan transactions and to recover interest payments because of commercial frustration of purpose. *Id.* at 1073. The frustration of purpose in that case was the result of a U.S. Supreme Court opinion that held that the transactions in question were a sham and that the interest payments were not deductible. *Id.* With analysis that is not directly applicable here, the *Walker* court determined that the case was ripe for application of the doctrine of frustration of purpose based on the parties' good-faith reliance that the interest deduction would be allowed. *Id.* at 1074.

Of the three principal cases Murff relies on, the most analogous is *Mayer.* Both *Mayer* and the case at hand involve an IRS ruling rendered after contract formation. *Mayer* does not aid Murff, however, because there the IRS ruling destroyed the value of the performance. The purchase price for the business was bargained based on tax implications that no longer were valid. In this case, the value of the contract lies in the settlement of the dispute of whether Murff was entitled to share in the distribution of the assets. The IRS ruling here shows that Murff need not have settled to recover from the ESOP, but the purpose of the contract—peaceful resolution of that claim—remains intact.

For the same reason, *Howard,* which was decided squarely on the doctrine of commercial frustration of purpose, does not aid Murff. The purpose of the *Howard* contract was to construct a building tailored to a bankrupt tenant. The tenant's bankruptcy rendered performance meaningless. Similarly, in *Walker,* a con-

tract could not be performed where the U.S. Supreme Court determined that it was premised on a sham and erroneous ideas about tax deductibility.

Again, in this case, the parties have essentially already performed: Murff released his claim; the ESOP and Jourdan paid him $150,000. The purpose of the settlement agreement—to effectuate a peaceful resolution—has been fulfilled. As noted *supra*, had Murff wished to include a contingency clause, e.g. that if the two similarly situated employees were able to recover in the even the ESOP distribution was managed differently, then Murff could have bargained for such a contingency. He did not.

█ "The doctrines of mutual mistake and commercial frustration are meant to have limited applications so as to preserve the certainty of contracts." *Shop 'N Save Warehouse Foods, Inc. v. Soffer*, 918 S.W.2d 851, 862 (Mo.App.1996). With that in mind, the court reiterates that because the purpose of the contract has not been frustrated and because Murff did not bargain for a contingency in the contract for a situation like this, he cannot succeed in this argument.

This point is denied.

### III.

█ In his third and fourth points, Murff argues that the trial court erred in approving the Receiver's plan because the doctrines of mutual mistake of fact and/or unilateral mistake of fact require that the settlement agreement and release be rescinded or declared void in that the bases upon which the parties entered into the agreement were not true.[2]

█ "To justify a recision because of a mistake, the mistake must relate to the existence or non-existence of a fact, past or present, material to the agreement and not to a future contingency." *In re Estate of Hysinger*, 785 S.W.2d 619, 624 (Mo.App. 1990). "The mistake must be as to a matter of fact, rather than law, and must be as to a fact constituting the basis of the agreement." *Id.*

█ The mistake may be either mutual or unilateral. "A mutual mistake means that both parties did what neither intended to do." *Shop 'N Save*, 918 S.W.2d at 862. Generally, an agreement may be rescinded or reformed by the doctrine of mutual mistake where each party labors under the same misconception. *Hysinger*, 785 S.W.2d at 624. A party must prove mutual mistake of material fact by clear, cogent and convincing evidence. *Id.*

█ A unilateral mistake may also be used to rescind a contract where: 1) enforcement would be unconscionable, or 2) where the other party had reason to know of the mistake. *Asbury v. Crawford Elec. Coop., Inc.*, 51 S.W.3d 152, 157 (Mo. App.2001). "In this situation courts show a lack of sympathy for a claim that one party did not understand the consequences of an act and, in general, courts are very reluctant to allow one party … to avoid a document or agreement for a mistake that was not shared by the other." *Hysinger*, 785 S.W.2d at 624. "Where the mistake has resulted solely from the negligence or inattention of the party seeking relief, and the other party is without fault, relief should not be granted absent unusual circumstances which would make enforcement of the agreement unjust." *Asbury*, 51 S.W.3d at 157.

---

**2.** Murff alludes at various points in his brief that perhaps the settlement agreement should be nullified based on fraud. He does not include this as a separate point (nor does he even make specific arguments) and thus preserves nothing for review.

In this case, Murff argues that three mistakes should preclude enforcement of the settlement agreement. The first allegation of mistake was that Murff's claim was filed late under the Receiver's deadline. As it turns out, the two similarly situated employees who never filed a claim are now entitled to participate in the distribution of the ESOP, and the Receiver's deadline was not applicable. The second allegation of mistake was that the ERISA statute of limitations time barred Murff's claim. Again, as it turns out, Murff's claim was not time barred under ERISA. Murff's third allegation of error was that the ESOP documents governing the parties' participation precluded him from receiving any interest in the ESOP. Again, but for the settlement agreement, Murff could have recovered a substantial sum under the ESOP.

The problem with Murff's contentions of mutual and/or unilateral mistakes is that these three assumptions are questions of law and not questions of fact. As noted *supra*, mistake as to law does not permit a party to rescind or void an agreement. *Hysinger*, 785 S.W.2d at 624. Rather, the mistake must be as to a fact constituting the basis of the agreement. *Id.*

At the time of the settlement agreement, Murff's right to participate in the ESOP was legally unknown. As for the two time bars, the Receiver believed that Murff's claim was time barred based on a deadline the Receiver imposed a couple of years before Murff sought to participate and based on federal law.

■■■ A mistake as to a statute of limitations in this case is not always a mistake of fact. *Thompson v. Volini*, 849 S.W.2d 48, 50 (Mo.App.1993). *Thompson* involved a settlement agreement as to a medical malpractice action. There, unbeknownst to the former patient and the doctor's medical malpractice insurance company, the parties entered into a settlement agreement after the statute of limitations for the malpractice claim had run. *Id.* at 49. This court held that the parties "tried to characterize this misconception as a mistake of fact" rather than of law. *Id.* at 51. However, in that case, the parties knew of the exact date of the treatment and failed to investigate the applicability of the statute of limitations before drafting the contract. *Id.*

■■■ Similarly, in this case, whether or not the Receiver's time bar or the ERISA statute of limitations applied was a question of law. There was no mistake of fact underlying the issue of whether Murff filed his claim too late: the battle was premised solely on legal grounds. "Normally, the running of a statute is a question for the court to decide." *Lomax v. Sewell*, 1 S.W.3d 548, 552 (Mo.App.1999). However, a question of fact as to a statute of limitations issue could be one for a fact-finder to determine—i.e. whether a petition was filed within a certain amount of time prescribed by statute. "[W]hen contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide." *Id.* at 552–53. In this case, the question was whether a federal statute or the Receiver's time bar was applicable, and no jury could have sorted that out. In short, because both parties were uncertain as to whether Murff could recover, they settled. The fact that part of the uncertainty hinged on whether one or two time bars precluded Murff's claim is irrelevant as it is a question of law.

The last argument Murff makes as to mistake of fact is based on the IRS ruling. But for that ruling, whether Murff was entitled to participate in the distribution of the ESOP would have remained legally unclear. This, too, is a question of law.

Again, rather than litigating that issue, the parties settled. Simply because it has been determined that Murff's position was the legally correct one is of no avail. The settlement agreement would not be voided if the IRS ruling had definitively declared that Murff and the two similarly situated employees could never participate in the ESOP's distribution, and it does not help Murff now.

■ Murff's claim here also fails to meet the mutual mistake doctrine's requirement that the mistake not relate to a future contingency. "A mutual mistake in prophesy or opinion is not a ground for recision where such mistake becomes evident through the passage of time." *Ludlow v. Ahrens*, 812 S.W.2d 245, 249 (Mo.App.1991)(husband not entitled to relief on property settlement where tax audit imposed additional tax liability). "What is today only a conjecture, an opinion, or a guess, might by tomorrow, through the exercise of hindsight, be regarded then as absolute fact." *Id.*

In this case, not only was Murff's ability to participate in the ESOP purely a question of law so that the doctrine of mutual mistake would not apply, but also, the definitive answer indicating that he could have in fact participated was not known at the time of the contract.

This point is denied.

## IV.

■ In his fifth point, Murff argues that the trial court erred in approving the Receiver's plan because of fundamental notions of fairness and justice. Murff cites as his arguments the circumstances surrounding the settlement agreement and release as well as the Receiver's unilateral acceptance of the IRS ruling and the recent inclusion of those similarly situated to Murff.

The gist of the argument is that Jourdan, who was involved with ProMed only a couple of years, will receive some $19,000,000 from the ESOP distribution, and Murff, an employee for eleven years, should be able to participate as well. Murff also cites other examples of ProMed employees who worked a much shorter period of time than he did, but who are recovering substantial sums under the ESOP. Murff also argues that the Receiver, as fiduciary, owes the parties a special confidence to act in good faith.

■ Murff cites no legal authority in support of his point, and in essence, Murff's point is based on public policy. Nonetheless, Murff ignores Missouri's policies that the "[f]reedom of contract and peaceful settlement of disputes are encouraged in the law," *B–Mall Co.*, 977 S.W.2d at 77, and that the law presumes that a release is valid. *Angoff*, 917 S.W.2d at 210. Moreover, the arguments in support of voiding the release are to be applied in rare circumstances, as noted *supra*. *Shop 'N Save*, 918 S.W.2d at 863; *Asbury*, 51 S.W.3d at 157. A review of Murff's argument leaves no indication of the Receiver's unjust treatment to Murff.

This point is denied.

The judgment of the trial court is affirmed.

BRECKENRIDGE, P.J., and SMART, J., concur.