IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

TIMOTHY J. GODDARD, an individual, )
                                   )        No. 68336-5-I
              Appellant/           )
              Cross-Respondent,    )        DIVISION ONE
                                   )
       v.                          )
                                   )
                                   )
CSK AUTO, Inc., an Arizona         )        UNPUBLISHED OPINION
Corporation,                       )
              Respondent/          )
              Cross-Appellant.     )        FILED: October 14, 2013

SPEARMAN, A.C.J. — The central issue in this appeal is whether Timothy

Goddard, after voluntarily resigning from CSK Auto, Inc., was obligated to repay

the company for relocation costs. Goddard sued CSK after CSK, citing a

promissory note relating to relocation expenses, withheld a portion of his last

paycheck. CSK counterclaimed, seeking recovery of additional relocation

expenses under various theories, including breach of the promissory note, and

alleging Goddard had violated a restrictive covenant by soliciting CSK employees

after he resigned. The trial court ruled that CSK was entitled to recover some of

the relocation expenses, dismissed CSK's counterclaim for breach of a non-

solicitation agreement, and entered judgment on CSK's breach of contract

counterclaim and its request for attorney's fees. Goddard appeals, contending

the trial court erred in dismissing his claims and granting summary judgment on

CSK's counterclaim for breach of the promissory note. He also contends the amount of the award of attorney's fees to CSK was unreasonable. CSK cross appeals, contending the trial court erred in ruling that CSK was not entitled to recover all of the relocation expenses and dismissing CSK's counterclaim for breach of the non-solicitation agreement. We affirm in all respects.

## FACTS

Goddard began working for CSK, an Arizona-based auto parts retailer, in 1984. In early 2008, when his position was eliminated, he agreed to accept a demotion to regional vice-president and move from Arizona to the Seattle area. The effective date of his transfer was January 28, 2008. Under CSK's Relocation Policy, Goddard was required to repay relocation expenses if he voluntarily resigned within 12 months "following the acceptance of a relocation. . . ." Clerk's Papers (CP) at 581. CSK also presented him with an Interim Promissory Note ("Promissory Note"), which was executed on February 15, 2008.[1] Under the

---

[1] The note states, in part:

> FOR VALUE RECEIVED, the undersigned Maker [Goddard] promises to pay to the order of CSK AUTO, INC. . . . the estimated relocation sum of Two Hundred Thirty Seven Thousand seven hundred fifty dollars and fifty cents, ($237750.50 adjusted for actual relocation payments made to or for the Maker, without interest, on or before thirty days of the first to occur of the maker: 1.) terminating employment with the company within two years from the effective date of transfer . . . .

> Maker hereby authorizes CSK Auto, Inc. to withhold such sum as may be necessary to repay this note from Maker's final paycheck and/or any other payment due Maker as a result of Maker's employment at CSK Auto, Inc. subject to final audit and final promissory note.

CP at 84.

Promissory Note, Goddard promised to repay relocation expenses if he terminated his employment "within two years from the effective date of transfer . . . ." Id. The relocation process apparently took several months. CSK ultimately paid $360,982.10 to relocate Goddard and his family.

During Goddard's relocation, CSK was in merger discussions with O'Reilly Automotive, Inc. (O'Reilly). On March 31, 2008, CSK presented Goddard with a Severance Agreement, whose purpose was to "foster the continuous employment of key management personnel" given a possible change of company control. CP at 86. Under the agreement, Goddard would be entitled to severance benefits for six months if his employment were terminated by CSK without cause or by Goddard for good reason.[2] His annual salary at the time was $177,000. The agreement also contained restrictive covenants, including a non-solicitation agreement. On May 16, CSK presented Goddard with a Letter Agreement assuring him he would continue to receive relocation benefits notwithstanding any change in company control. The Letter Agreement stated that "from and after the consummation of the Change in Control and until the completion of your permanent relocation," CSK would reimburse relocation expenses on terms, in any event, no less favorable than the Relocation Policy. CSK was acquired by O'Reilly on July 11 and became its subsidiary.

---

[2] Severance benefits included accrued vacation and base salary continuation in accordance with normal payroll practices for six months after termination, with continuation of benefits.

3

In August 2008, Goddard participated in a meeting with other regional vice presidents. At the meeting, O'Reilly's management acknowledged the Severance Agreement and gave the regional vice presidents the option to resign and be compensated under that agreement. Ted Wise, O'Reilly's co-president, then offered Goddard a regional manager position, with a starting pay of $145,000. Wise informed Goddard that if he stayed, he would have to sign a Voluntary Rescission of Severance Agreement ("Rescission Agreement"). CP at 59. Goddard accepted the position, as reflected in an Offer of Employment signed on August 25, 2008, and signed the Rescission Agreement.[3]

Under the Rescission Agreement, CSK agreed, in consideration for Goddard's continued employment after the merger, to accelerate the payment of the severance benefits described in the Severance Agreement despite the fact that his employment would continue. Goddard would receive the payment on July 1, 2009 only if he was employed on that date or, if not employed, had not voluntarily resigned. The Rescission Agreement generally rescinded the Severance Agreement but retained the latter's restrictive covenants. It also contained release provisions: Section 5(b) ("release provision") released Goddard and Section 5(a) released CSK.

CSK remitted to Goddard the payment described in the Rescission Agreement several weeks early, on June 12, 2009.[4] Goddard voluntarily resigned

---

[3] Goddard believes he signed the Rescission Agreement around the same time he signed the Offer of Employment in August 2008.

[4] The payment amounted to $88,500.

4

on July 2 and began working as a regional manager for AutoZone, CSK's

competitor, on July 6. On July 8, Jack Morefield, director of human

resources/payroll for CSK, informed Goddard by letter:

> On February 15, 2008 you signed an Interim Promissory Note for the estimated relocation expenses related to your move to the Seattle area. . . . Due to your voluntary resignation before completing 2 years of employment after the effective date of your transfer, the note is now due and payable.

CP at 111. CSK offset most of Goddard's final paycheck under the terms of the

Promissory Note, paying him $615.60 in salary to comply with minimum wage

obligations.[5]

Over the next few months, three district managers left CSK to work for

AutoZone. Goddard was involved in recruiting them. CSK employee Derek Reid

met with Goddard. CSK offered Reid a $5,000 annual salary increase and

persuaded him to stay.

On August 28, 2009, Goddard filed a complaint against CSK, seeking

recovery of the amounts it deducted from his final paycheck.[6] CSK

counterclaimed, seeking recovery of additional relocation expenses and an

---

[5] But for the offset, Goddard would have been paid the gross amount of $28,976.98 (including salary and accrued vacation pay).

[6] He asserted claims for (1) failure to pay wages; (2) breach of contract and breach of promise of specific treatment; (3) willful withholding of wages subject to double damages under RCW 49.52.070; (4) unjust enrichment; and (5) attorney's fees under RCW 49.48.030.

injunction related to the restrictive covenants.[7] The parties agreed to an injunction regarding further breaches of the restrictive covenants. They conducted discovery and filed motions for partial summary judgment on July 22, 2011.[8] Goddard's main argument as to why he was not obligated to repay any relocation expenses was that the release provision in the Rescission Agreement released him from any obligations under the Promissory Note.

The trial court entered an order ruling that the release provision covered only matters that occurred before the signing of the Rescission Agreement and that Goddard's obligation to repay relocation expenses did not occur until afterward. It also ruled that the Rescission Agreement excluded employment matters, including the parties' agreement regarding relocation expenses. Goddard moved for reconsideration. The court then entered an order (1) granting CSK's motion for summary judgment on its counterclaim for breach of the Promissory Note and denying Goddard's motion for reconsideration on that issue and (2) denying CSK's motion for summary judgment on its counterclaim for breach of the non-solicitation agreement.

On November 2, 2011, the trial court entered a final summary judgment order. It generally affirmed its prior rulings but also ruled that the Letter

---

[7] Its counterclaims were for (1) breach of the Promissory Note and/or Relocation Policy; (2) breach of restrictive covenants under the Severance Agreement and Rescission Agreement; (3) unjust enrichment; and (4) attorney's fees under the Promissory Note.

[8] Goddard moved for partial summary judgment on liability and sought dismissal of CSK's counterclaims for breach of the Promissory Note and/or Relocation Policy and unjust enrichment. CSK moved for dismissal of all of Goddard's claims and summary judgment on liability as to its counterclaims for relocation expenses, unjust enrichment, and breach of the non-solicitation agreement.

Agreement precluded CSK from recovering expenses paid after the merger. It dismissed the parties' claims for unjust enrichment. The parties reached a stipulation on the amount of relocation-related damages ($181,166.64) CSK could recover under the November 2 order. CSK moved for attorney's fees, citing a provision in the Promissory Note. The trial court awarded attorney's fees to CSK in the amount of $76,060 and entered a total judgment of $257,226.64.

Goddard appeals and CSK cross appeals.[9]

## DISCUSSION

The issues before us are (1) whether the release provision released Goddard from his obligations under the Promissory Note; (2) whether CSK was entitled to relocation expenses paid after the merger; (3) whether CSK's counterclaim for breach of the non-solicitation agreement was properly dismissed; and (4) whether the award of attorney's fees to CSK was reasonable.

We review de novo a trial court's summary judgment order, engaging in the same inquiry as the trial court. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider the facts and all reasonable inferences in

---

[9] Goddard does not appeal the dismissal of his unjust enrichment claim. CSK cross appeals the trial court's denial of summary judgment on its counterclaims for breach of the non-solicitation agreement and unjust enrichment. Parties generally may not appeal a denial of a motion for summary judgment. Tapps Brewing, Inc. v. City of Sumner, 106 Wn. App. 79, 82, 22 P.3d 280 (2001)) (citations omitted). However, the parties agree that the trial court's orders had the effect of dismissing CSK's counterclaims, and Goddard does not argue that CSK may not cross appeal these issues. Therefore, we treat them as properly before us. See also RAP 2.2(a)(3) ("[a]ny written decision affecting a substantial right in a civil case that in effect determines the action and . . . discontinues the action" may be appealed).

the light most favorable to the nonmoving party. Right-Price Recreation, LLC v. Connells Prairie Cmty. Council, 146 Wn.2d 370, 381, 46 P.3d 789 (2002).

Effect of Release Provision on Goddard's
Reimbursement Obligations

The parties agree that Missouri law governs the interpretation of the release provision under the Rescission Agreement's choice-of-law provision. CP 550. Under Missouri law, the interpretation of release agreements is governed by the same principles used in interpreting any contract. Liquidation of Professional Medical Ins. Co. v. Lakin, 88 S.W.3d 471, 476 (Mo. App. 2002).

> The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention. If there is no ambiguity, then the intention of the parties should be determined from the contract alone. A contract is ambiguous only if its terms are susceptible to more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms. If there is no ambiguity, then the court need not resort to construction of the contract, and instead intent is determined from the four corners of the contract.

Id. (internal citations and quotation marks omitted).

"A general release uses language such as 'from any and all claims, causes of action or liability of any sort whatsoever[,] 'from any and all liability,' 'of whatever name or nature,' and 'any other matter whatsoever involving my relationship with [the entity].'" Anderson v. Curators of University of Missouri, 103 S.W.3d 394, 399 (Mo. App. 2003) (internal quotation marks and citation omitted). It disposes of the entire subject matter involved. Id. at 398-99; Goldring v. Franklin Equity Leasing Co., 195 S.W.3d 453, 456-57 (Mo. App. 2006). A "general release which is not restricted by its terms to particular claims or

demands will ordinarily be regarded as embracing all claims or demands <u>which had matured</u> at the time of its execution." <u>Daniels v. Tip Top Plumbing and Heating, Inc.</u>, 409 S.W.2d 741, 745 (Mo. App. 1966) (quoting <u>Williams v. Riley</u>, 243 S.W.2d 122, 124 (Mo. App. 1951)) (emphasis added).

The release provision in this case states:

> The Company hereby agrees not to pursue or further any action, cause of action, right, suit, debt, compensation, expense, liability, contract, controversy, agreement, promise, damage judgment, demand or claim whatsoever at law or in equity whether known or unknown which the Company ever had, now has, or hereafter can, shall or may have for, upon or by any reason of any matter, cause or thing (collectively "Company Claims") whatsoever occurring up to and including the date Executive signs this Rescission Agreement against Executive and hereby releases, acquits, and forever absolutely discharges Executive of and from all of the foregoing, except with respect to the obligations of Executive set forth in this Rescission Agreement.

CP at 549.

Goddard argues that the plain language of the release provision released him from all debts, expenses, obligations, and contracts that CSK had as of the date the Rescission Agreement was executed, which included the Promissory Note and the Relocation Policy as referenced in the Letter Agreement. CSK argues that the release provision did not cover non-matured claims and that CSK's claim for reimbursement under the Promissory Note and the Relocation Policy did not occur until Goddard resigned. We agree with CSK.

The release provision contains broad language, like that of a general release. However, it did not release Goddard from his duty to repay under the terms of the Promissory Note because the duty—and CSK's claims under the

9

note—did not mature until after the Rescission Agreement was signed. The release provision applied to all actions, debts, etc. which CSK had or could have for any "matter, cause or thing . . . whatsoever occurring up to and including the date" Goddard signed the Rescission Agreement. CSK's claims under the Promissory Note had not matured when the Rescission Agreement was executed; the basis for its claims did not exist until July 2, 2009, the day Goddard resigned.

Goddard does not argue that his duties under the Promissory Note matured before the signing of the Rescission Agreement. Instead, he contends that a non-matured duty can be subject to the terms of a release, citing RESTATEMENT (SECOND) OF CONTRACTS § 284, CMT. (a) (1981)[10] in support. But comment (a) distinguishes between a release and a promise to discharge a duty in the future: "A purported release of a duty that is revived on the occurrence of a condition is not a release but a contract not to sue." The release provision did not make a promise not to sue for non-matured claims, but rather was limited to

---

[10] Comment (a) (1981) provides, in pertinent part:

> a. *Nature of release.* Although no particular form is required for an agreement to discharge a duty, the term "release" has traditionally been reserved for a formal written statement by an obligee that the obligor's duty is discharged. That usage is preserved in this Section. No special words are required and the writing may state, for example, that it releases the obligor, that it releases the obligor's duties or that it releases the obligee's rights. It must, however, take effect immediately or on the occurrence of a condition. A promise to discharge in the future an existing duty merely creates a new duty that can itself be discharged by the parties. Such a promise is not a release. <u>The duty that is released need not be matured. A purported release of a duty that does not yet exist, however, is not a release but a promise to discharge a duty in the future.</u> See Illustration 3. <u>A purported release of a duty that is revived on the occurrence of a condition is not a release but a contract not to sue.</u>

(Emphasis Goddard's).

things "occurring up to and including the date of" the Rescission Agreement. CSK did not make a promise to discharge, in the future, a duty that did not yet exist, or promise not to sue for non-matured claims.

Accordingly, the trial court properly dismissed Goddard's claims seeking the amounts offset from his final paycheck and properly granted partial summary judgment to CSK for relocation costs the company paid before the merger.[11]

## Relocation Expenses after Merger

CSK contends the trial court erred in ruling that CSK was not entitled to relocation expenses it paid after the merger.[12] It contends the Letter Agreement did not preclude it from recovering expenses paid after the merger and that it was, in any event, entitled to recover those expenses under the Relocation Policy or under an unjust enrichment theory.

### I. Effect of Letter Agreement

The Letter Agreement provides, in pertinent part:

> The Company agrees that if, prior to completion of your permanent relocation to the Seattle, Washington area, the Company enters into an agreement that, if consummated, would result in a Change in Control . . . then from and after the consummation of the Change in Control and until the completion of your permanent relocation to the Seattle, Washington area (including the purchase of a new home in the Seattle, Washington

---

[11] Because the release provision did not release Goddard from his obligations under the Promissory Note, his claims for exemplary damages and attorney's fees for willful withholding under RCW 49.52.050 and RCW 49.52.070 were also properly dismissed. The Promissory Note permitted CSK to withhold amounts from his final paycheck.

As for the trial court's ruling that the the Rescission Agreement excluded employment matters, including the parties' agreement regarding relocation expenses, we do not reach it given the basis for our decision.

[12] CSK seeks the additional principal amount of $191,084, plus interest.

area), the company (and any successor thereto) will continue to reimburse you for relocation, home sale and purchase, and temporary living expenses (including the temporary housing currently provided to you) on terms no less favorable than those provided to you prior to the consummation of the Change in Control, and in any event, no less favorable than the CSK Auto, Inc. Relocation Policy as in effect and applicable to you prior to the Change in Control.

CP at 598.

The Letter Agreement informed Goddard that "from and after the consummation of the Change in Control and until the completion of your permanent relocation," CSK would reimburse relocation expenses on terms, in any event, no less favorable than the Relocation Policy. The Relocation Policy provides that "[i]f a relocated associate voluntarily terminates his/her employment within twelve (12) calendar months following the acceptance of a relocation, he/she will be required to refund all or part of the monies extended to him/her by the company or its agents." CP at 581. The Promissory Note, on the other hand, required Goddard to repay relocation expenses if he resigned within two years from the effective date of transfer. The former term is more favorable to Goddard than the latter, so the Relocation Policy term governs the repayment of expenses paid after the merger. And under the Relocation Policy, Goddard's repayment obligations expired by the time he resigned on July 2, 2009; his termination was more than 12 months after the effective date of his transfer, January 28, 2008.

CSK argues that the intent of the Letter Agreement was to simply maintain the status quo and ensure that CSK did not impose less favorable relocation terms after the merger. But whether it was CSK's subjective intent to maintain the

12

status quo, the Letter Agreement makes no reference to the Promissory Note and its language is plain. It states that "in any event" Goddard would, after the merger, be reimbursed on terms no less favorable than those contained in the Relocation Policy. We focus on the parties' objective manifestations of intent rather than their unexpressed subjective intent. Hearst Communications, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005). The trial court properly applied the Letter Agreement.

## II. Relocation Policy

CSK also argues that it was permitted under the Relocation Policy to recover certain expenses (those paid in the 12 months prior to termination), independent of the Promissory Note. CSK does not contest Goddard's assertion that the date of his "acceptance of a relocation" was January 28, 2008. Instead, it relies on the provision in the Relocation Policy that states, "[i]n all cases where there is a question of interpretation of policy, the decision of [the] Relocation Services Senior Travel Manager shall prevail." CP at 581. It contends the only declarant with knowledge of the meaning of the policy language is Jack Morefield, who explained that the language creates a rolling 12-month obligation period requiring Goddard to repay relocation payments accepted by him or made by CSK on his behalf in the 12-month period prior to termination. But the Relocation Policy language is unambiguous. There is no debatable question, and we need not give effect to Morefield's interpretation.

III. Unjust enrichment

CSK contends, in the alternative, that it was entitled to recover relocation expenses paid after the merger under an unjust enrichment theory. We disagree. "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it."[13] Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008) (emphasis added). Unjust enrichment does not apply where there is a valid contract governing the rights and obligations of the parties. Here, there were specific agreements (the Promissory Note and Relocation Policy) governing the extent to which CSK could recover relocation expenses.

### CSK's Counterclaim for Breach of Non-Compete Agreement

CSK cross appeals the trial court's dismissal of its counterclaim for breach of the non-solicitation agreement. Goddard does not dispute that he solicited Reid after joining AutoZone. He only argues that the agreement did not apply at the time he solicited Reid and that CSK did not suffer damages.

Section 5 of the Severance Agreement, incorporated into the Rescission Agreement, provides:

5.2 Agreement Not to Compete/Non-Solicitation

(a) While employed by the Company and during the Severance Period following the Executive's termination of employment under circumstances entitling the Executive to the Standard Severance Benefits (the "Non-Compete Period"), the Executive shall not

_____

[13] Unjust enrichment is an equitable remedy sounding in quasi-contract, and its elements are: (1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment. Young, 164 Wn.2d at 484-85.

14

become engaged in a managerial or executive capacity for, or consultant to, Auto Zone, Inc., The Pep Boys - Manny, Moe & Jack, O'Reilly Automotive, Inc., Advance Stores Company, Incorporated, or Discount Auto Parts, Inc.[;]

(b) During the Non-Compete Period, the Executive shall not, directly or indirectly, hire or attempt to hire any employee of the Company.

CP at 90.

CSK argues that this court must square the Rescission Agreement's retention of Section 5 of the Severance Agreement with the Rescission Agreement's contemplation of paying Goddard a pre-termination, lump-sum payment, and thus read into Section 5.2(a) a post-termination non-compete period of six months (following the date he was paid the "severance" benefits on June 12, 2009). It notes the "Severance Period" had been defined in paragraph 2.2(b) of the Severance Agreement as "the longer of (i) six months or (ii) one week for every full year [Goddard] was employed by the Company and its Affiliates prior to the date [Goddard's] employment was terminated," and that Goddard's severance period was six months. CP at 88.

We conclude the non-solicitation agreement was not in effect when Goddard solicited Reid. The plain language of Section 5.2(a) states that the restriction applied "during the Severance Period following [his] termination of employment under circumstances entitling [him] to the Standard Severance Benefits." CP 90. When Goddard resigned in July 2009, he was not entitled to severance benefits. Thus, there was no post-termination non-compete period during which Goddard was prohibited from soliciting CSK employees. The plain language controls.

15

Award of Attorney's Fees to CSK Below

The reasonableness of an attorney fee award is reviewed for abuse of discretion. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). The party challenging the award bears the burden of demonstrating that the award was clearly untenable or manifestly unreasonable. In re Marriage of Crosetto, 82 Wn. App. 545, 563, 918 P.2d 954 (1996) (internal citation omitted).

Goddard contends the amount of the trial court's award of attorney's fees to CSK ($76,060)[14] was unreasonable. Specifically, he contends the court awarded fees for duplicative work with respect to his deposition, the summary judgment hearing, and the mediation. First, he points out that Ronald Polly billed 13.2 hours to prepare for and take his deposition while Matthew Boyd billed 14.3 hours to prepare for it. He suggests that both billed for attending the deposition. CSK responds that there was no duplication in the tasks to prepare for the deposition and correctly notes that only Polly billed to attend it. While it is impossible to verify whether there was duplication in the tasks (the time entries are not specific), we agree with CSK because Goddard does not argue that the total time billed for the mediation was unreasonable.

Next, Goddard contends it was duplicative for Boyd and Polly to prepare for and attend the summary judgment hearing (18 and 6.9 hours, respectively). CSK responds that given the critical nature of a summary judgment hearing and the multiple claims, it was reasonable that two attorneys prepared for it. We

---

[14] The trial court arrived at this amount after discounting entries for one attorney by 16.3 hours.

agree with CSK; Goddard does not show that the total amount of time spent was excessive.

Goddard contends time spent on mediation was excessive, noting that Boyd billed 2.3 hours to draft the mediation statement, 12 hours to prepare (including travel), 6 hours to attend, and 9 hours to return. Polly billed 3.4 hours to prepare and assist with mediation. In contrast, he notes, his counsel spent a total of 5.5 hours related to mediation. Goddard argues that CSK's attorneys spent more time than his did, thus they were unreasonable. But he does not show that any time entries of CSK's attorneys were unreasonable.

Finally, Goddard takes issue with CSK's retention of Georgia counsel, Polly and Boyd, which required retention of local counsel. He cites no authority to show that a party may not request fees for out-of-state and local counsel. He points out that local counsel billed 1.2 hours for consultation on court rules governing a witness deadline while Boyd billed 4.3 hours the same day for revising the witness list and conferring with local counsel. He points out that CSK sought billing for Georgia counsel to become admitted pro hac vice. But he does not show that these were unreasonable items for which to bill.

<u>Attorney's Fees on Appeal</u>

Both parties request attorney's fees on appeal under RAP 18.1. Goddard cites RCW 49.52.070[15] and equitable principles. CSK cites the Promissory Note

---

[15] RCW 49.52.070 provides that the employer shall be liable for a violation of RCW 49.52.050 for amounts to include "costs of suit and a reasonable sum for attorney's fees."

No. 68336-5-I/18

and equitable principles. Because neither party prevails on appeal, we do not award fees.

  Affirmed.

WE CONCUR:

Spearman, A.C.J.

Verellen, J.

Schindler, J.